UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>Plaintiff,<br>v.<br>FRANCIS BURGA, et al.,<br>Defendants. | Case No. 18-cv-01633-BLF (SVK)<br><br>**ORDER REGARDING THE UNITED STATES' MOTION CHALLENGING RESPONDENTS' ASSERTIONS OF PRIVILEGE**<br><br>Re: Dkt. Nos. 26, 32, 34 |

## I. INTRODUCTION

Before the Court is the United States' motion to compel challenging various assertions of privilege over documents withheld during discovery by Respondents Francis Burga, individually and as the administrator of the estate of her late husband, Margelus Burga ("Estate"), and Russell Mansky (collectively "Respondents"). Dkt. 26. On July 2, 2019, Ms. Burga filed an opposition to the United States' motion to compel. Dkt. 32. Mr. Mansky joins her opposition. Dkt. 33.

For the reasons discussed below and set forth at the July 30, 2019 hearing, the Court **GRANTS IN PART** and **DENIES IN PART** the United States' motion challenging Respondents' privilege assertions. The Court further finds that a final ruling on Respondents' privilege assertions requires an in-camera review of the documents at issue. As a result, as discussed at the hearing, the Court will appoint a special master to review the documents withheld by Respondents in accordance with the Court's rulings in this order. *See* Section IV, *infra*.

## II. BACKGROUND

The Internal Revenue Service ("IRS") began an examination of Margelus and Francis Burga in 2007. Dkt. 26 at 1. The IRS alleges that the Burgas "created a large and complex international structure of businesses that they used to divert income." *Id.* at 2. This includes

certain foundations in Liechtenstein which hold numerous entities and businesses ("Liechtenstein Foundations"). Dkt. 32 at 1. In January 2010, Mr. Burga died in Switzerland. Dkt. 26 at 2. Shortly thereafter, Ms. Burga was made the protector of the Marfran *stiftung*, one of the Liechtenstein Foundations. Dkt. 26 at 2; Matchison Decl., Ex. A at 3, Dkt. 26-3. Ms. Burga maintains that she only learned of the Liechtenstein Foundations after the death of her husband. Burga Decl. ¶¶ 48–49, 52, Dkt. 32-1. She also maintains that she first learned of the IRS's examination of her and the details of her and her husband's joint tax returns after his death. *Id.* at ¶¶ 46–49.

In late March 2010, Ms. Burga received five letters from the IRS concerning certain foreign entities. *Id.* at ¶ 47; Kingston Decl. ¶¶ 4–5, Dkt. 32-1. A few weeks later, Ms. Burga retained an attorney, Emily Kingston of Sideman & Bancroft LLP ("Sideman & Bancroft"), to represent her in the IRS audit and help her respond to the IRS letters. Burga Decl. ¶ 48, Dkt. 32-1. Ms. Burga and Ms. Kingston traveled to Liechtenstein in June 2010 to meet with Peter Meier, a Lichtenstein businessman who assisted Mr. Burga in various business activities, and his counsel, Siegbert Lampert. Dkt. 26 at 2; Dkt. 32 at 2; Dkt. 32-1 at 13. Respondents claim that they made the trip "[i]n an effort to cooperate with the IRS audit and understand what was at issue" because Ms. Burga believed that Mr. Meier might have information pertaining to the IRS audit. Dkt. 32 at 2. At the meeting, Ms. Burga learned that Mr. Meier had helped Mr. Burga create the Liechtenstein Foundations, that Mr. Meier served on the board of the Liechtenstein Foundations and that the board controlled the Liechtenstein Foundations and their underlying entities. *Id.* It was also at that meeting that Mr. Lampert insisted that the parties enter into a joint defense agreement. Dkt. 26 at 2; Dkt. 32 at 2; Lampert Decl. ¶ 5–6, Dkt. 32-3.

This motion arises out of the enforcement of six IRS summonses directed to Respondents in the 2001–2012 timeframe pursuant to which Ms. Burga claims to have produced over of 70,000 pages of documents. Dkt. 1; Kingston Decl. ¶ 11, Dkt. 32-1. Respondents have also created a privilege log which, as discussed at the hearing, claims privilege over approximately 600 documents (Dkt. 26-4). The privilege log identifies five general categories of purportedly privileged documents: (1) documents covered by a joint defense and information sharing

2

1 agreement between Ms. Burga, as representative of Mr. Burga and the Estate, and Mr. Meier;
2 (2) documents covered by attorney-client privilege; (3) documents protected under the work
3 product doctrine; (4) documents covered by the tax practitioner privilege; and (5) documents
4 protected pursuant to a *Kovel* agreement between Mr. Mansky and Ms. Burga's attorneys. Dkt. 32
5 at 1. The scope of these privileges and their applicability to the subject documents are the issues
6 before the Court.

### III. DISCUSSION

#### A. Respondents' Joint Defense Agreement

On June 26, 2010, Ms. Burga signed a joint defense and information sharing agreement with Mr. Meier on behalf of her husband and the Estate ("Joint Defense Agreement"). Respondents contend that Ms. Burga, Mr. Meier and their counsel shared a common legal interest because they "had a legal obligation and interest in ensuring that the IRS examination was conducted properly and any potential tax liabilities were valid." Dkt. 32 at 6. Respondents further contend that this protection extends to Mr. Meier's associates, Michael Kind and Rosa Prete.[1] The United States challenges this privilege assertion, arguing that Respondents fail to establish the necessary elements of the joint defense privilege, including a shared common legal interest. Dkt. 26 at 4.

#### 1. Legal Background

Although "voluntarily disclosing privileged documents to third parties will generally destroy [a] privilege," courts recognize that a party may maintain a privilege claim despite disclosure based on the common interest or joint defense rule. *In re Pac. Pictures Corp.*, 679 F.3d 1121, 1126–27 (9th Cir. 2012). In this sense, "the 'common interest' or 'joint defense' rule" functions as "an exception to ordinary waiver rules designed to allow attorneys for different clients pursuing a common legal strategy to communicate with each other." *Id.* at 1129. The joint defense rule is not "a separate privilege." *Id.* It "applies where (1) the communication is made by

---

[1] In disputing the reach of the Joint Defense Agreement in their briefs, the Parties argue the actual titles and roles of Michael Kind and Rosa Prete. Because the Court does not find a viable Joint Defense Agreement for the reasons stated herein, it does not need to reach these issues. *See* Section III(B), *infra*.

3

separate parties in the course of a matter of common [legal] interest; (2) the communication is designed to further that effort; and (3) the privilege has not been waived." *Nidec Corp. v. Victor Co. of Japan*, 249 F.R.D. 575, 578 (N.D. Cal. 2007) (quoting *United States v. Bergonzi*, 216 F.R.D. 487, 495 (N.D.Cal.2003)) (internal quotation marks omitted).

The common legal interest necessary to invoke the joint defense rule requires more than "a shared desire to see the same outcome in a legal matter." *In re Pac. Pictures Corp.*, 679 F.3d 1121, 1129 (9th Cir. 2012). "Instead, the parties must make the communication in pursuit of a joint strategy in accordance with some form of agreement—whether written or unwritten." *Id.* For example, in *Planned Parenthood Fed'n of Am., Inc. v. Ctr. for Med. Progress*, the Court found that the defendants failed to establish a common legal interest between one of the defendants, a non-profit, and three of its major donors. 2019 WL 1589974, at *8–10 (N.D. Cal. Apr. 11, 2019). The Court rejected the defendant's argument that the nonprofit and its donors had a shared legal interest in ensuring that the non-profit's investigation of Planned Parenthood was complying with federal and state law because such compliance was necessary to accomplish the nonprofit's mission. *Id.* at *9. Further, the Court found that the defendants' reference to possible litigation similarly did not establish a common legal interest because they failed to "specifically describe any shared litigation threat in which their interests are 'identically aligned.'" *Id.* at *10. A common legal interest thus requires more than a general strategy of legal compliance to accomplish a shared goal.

### 2. Respondents fail to show a common legal interest

Respondents fail to show that Ms. Burga's and Mr. Meier's "legal obligation and interest in ensuring that the IRS examination was conducted properly and any potential tax liabilities were valid" (Dkt. 32 at 6) qualifies as a common legal interest. While ongoing litigation is not necessary to invoke the joint defense rule, Respondents fail to articulate what "common *legal* interest or strategy" and what "particular *legal* goal" they share. *Schaeffler v. United States*, 806 F.3d 34, 42 (2d Cir. 2015) (emphasis added.). Indeed, Mr. Meier's desire that Ms. Burga comply with federal tax law to ensure the validity of her tax liabilities falls short of the common interest rejected in *Planned Parenthood*. There, the Court found that one party's desire to ensure another

4

party's compliance with the law to further a shared mission is not, by itself, sufficient to establish a common legal interest. *Planned Parenthood*, 2019 WL 1589974, at *10. Here, Respondents do not even assert that they share a common goal in the result of Ms. Burga's legal compliance. Ms. Burga presumably wants to limit her personal tax liability, while Mr. Meier's stated interest is protecting the assets of the Liechtenstein Foundations as their fiduciary. Lambert Decl. ¶ 8, Dkt. 32-3. Mr. Meier's counsel even anticipated a potential dispute between Ms. Burga and Mr. Meier, stating that when they entered into the Joint Defense Agreement he "was also concerned that the IRS examination might result in taxes being assessed against Francis Burga and/or the Estate of Margelus Burga and that the United States might then attempt to seize the assets of the Stiftungs in Liechtenstein to satisfy those taxes." *Id.* Thus, far from identifying a "shared litigation threat in which their interests are 'identically aligned,'" the only potential legal action Respondents identify would likely pit Ms. Burga's interests against Mr. Meier's. *Planned Parenthood*, 2019 WL 1589974, at *10. Accordingly, Respondents do not identify a common legal interest sufficient to support invoking the joint defense rule.

Respondents also argue that the signed Joint Defense Agreement provides "strong proof of their common interest and intent to pursue a joint legal strategy related to the IRS examination." Dkt. 32 at 7. However, the joint defense rule does not require a written agreement, *United States v. Gonzalez*, 669 F.3d 974, 979 (9th Cir. 2012), and a written agreement does not create a common legal interest where none exists. Beyond Mr. Meier's counsel's speculation that the IRS may target Mr. Meier based on highly generalized "media reports," Respondents offer no basis for a belief that Mr. Meier or the Liechtenstein Foundations would be or even could be the subject of an IRS enforcement action. Lambert Decl. ¶ 7, Dkt. 32-3. Moreover, Mr. Meier is not an IRS target, and the Liechtenstein Foundations are not defendants in this enforcement action. Indeed, Mr. Meier maintains that the Liechtenstein Foundations are separate legal entities with independent tax obligations. Meier Decl., Dkt. 32-1 at 14. Respondents further maintain that Ms. Burga has no control over the Liechtenstein Foundations. Matchison Decl., Ex. A at 2–4, Dkt. 26-3. These significant degrees of separation further undermine Respondents' argument that a common legal interest exists. Accordingly, the Court finds that Respondents fail to identify a

5

common legal interest, and therefore fail to establish that the joint defense rule applies to communications with between Ms. Burga and Mr. Meier and his associates.

### B. Attorney-Client Privilege

There does not appear to be a dispute that communications solely between Ms. Burga and her attorney, Ms. Kingston, are privileged. However, because the Court finds that Respondents fail to establish that the joint defense rule applies, sharing attorney-client privileged communications with Mr. Meier and/or his associates waived Respondents' attorney-client privilege claims over those communications. Dkt. 32 at 10.

### C. Work Product Doctrine

Respondents contend that the work product doctrine protects numerous documents which "were prepared in response to the IRS examination and in anticipation of litigation with the IRS." Dkt. 32 at 9. The United States challenges Respondents' assertion on two grounds. Dkt. 34 at 6–8. First, the United States argues that Respondents fail to establish that they created the documents at issue in anticipation of litigation. *Id.* at 6–7. Second, the United States argues that the work product doctrine only applies to work product created by a party or her representative. *Id.* at 6–8.

#### 1. Legal Background

The work product doctrine generally protects "documents and tangible things that are prepared in anticipation of litigation or for trial by or for another party or its representative." Fed. R. Civ. P. 26(b)(3)(A). "[T]o qualify for protection against discovery under [Rule 26(b)(3)], documents must have two characteristics: (1) they must be 'prepared in anticipation of litigation or for trial,' and (2) they must be prepared 'by or for another party or by or for that other party's representative.'" *In re California Pub. Utils. Comm'n*, 892 F.2d 778, 780–81 (9th Cir.1989) ("*In re CPUC*") (quoting Fed. R. Civ. P. 26(b)(3)).

Where a document serves both a litigation and non-litigation purpose, the Ninth Circuit applies the "because of" standard to determine whether a party or her representative created that document in anticipation of litigation. *In re Grand Jury Subpoena Mark Torf/Torf Envtl. Mgmt.*, 357 F.3d 900, 907 (9th Cir. 2004) (internal quotation marks omitted). Instead of considering

"whether litigation was a primary or secondary motive behind the creation of a document," the "because of" standard "considers the totality of the circumstances and affords protection when it can fairly be said that the 'document was created because of anticipated litigation, and would not have been created in substantially similar form but for the prospect of that litigation[.]'" *Id.* at 908 (quoting *United States v. Adlman*, 134 F.3d 1194, 1195 (2nd Cir.1998)). The anticipation of litigation requirement is a fact intensive inquiry, and "'the nature of the document *and* the factual situation of the particular case' are key to a determination of whether work product protection applies." *Id.* (emphasis in original) (citation omitted).

### 2. The work product doctrine may apply to documents prepared during the IRS's examination of Respondents

Only work product created in anticipation of litigation qualifies for protection under the work product doctrine. The simultaneous nature of the IRS's examination and Respondents' ongoing tax and legal obligations presents a challenge in determining whether Respondents or their representatives created a document in anticipation of litigation. Under the right circumstances, a party may create work product during the course of an IRS investigation in anticipation of litigation. *United States v. Roxworthy*, 457 F.3d 590, 594–600 (6th Cir. 2006). In contrast, documents that would have been prepared for a party's tax filings regardless of the IRS examination may not qualify as work product. *See United States v. Richey*, 632 F.3d 559, 568 (9th Cir. 2011) (rejecting a work product protection claim over an appraisal prepared for a federal income tax return). A court therefore must examine the underlying facts to determine when the party claiming work product protection reasonably anticipated litigation and the nature of the document's purpose. For example, the Sixth Circuit found that two memoranda regarding the tax consequences of certain transactions were created in anticipation of litigation where (1) the company's size made "a yearly IRS audit . . . a certainty;" (2) the transaction "involved a $112 million discrepancy between tax loss and book loss;" and (3) "the company had been advised . . . that the area of law was unsettled and that the IRS had recently targeted this type of transaction." *Roxworthy*, 457 F.3d at 600. This level of factual detail is not currently before the Court. Accordingly, the Court cannot yet determine the precise time when Respondents reasonably

7

anticipated litigation or the purpose of the documents Respondents claim fall under this protection. The Court thus finds that the special master must review the documents Respondents have withheld based on the work product doctrine to determine whether the privilege applies.

While Respondents are correct that disclosure of work product to friendly parties such as Mr. Meier or his agents does not necessarily waive Respondents' work product protection claim, s*ee Nidec*, 249 F.R.D. at 580, any withheld documents must still qualify as work product. That means that Respondents or their representatives must have created the documents in the first instance—not Mr. Meier or his agents, over whom Respondents maintain they have no control. Lampert Decl. ¶¶ 11–13, Dkt. 32-3; Matchison Decl., Ex. A at 2–4, Dkt. 26-3; *See also In re CPUC*, 892 F.2d at 781 (noting that the work product doctrine "on its face, limits its protection to one who is a party (or a party's representative) to the litigation in which discovery is sought") (citations omitted). It is possible, however, that Mr. Meier or his agents created documents at the direction of Ms. Burga or her representatives and that those documents may qualify for work product protection. For instance, Ms. Burga's attorney may have sent Mr. Meier questions related to anticipated litigation with the IRS. Mr. Meier's response to those questions likely still falls under the work production doctrine. But without reviewing the documents themselves, the Court cannot determine whether Respondents have impermissibly withheld documents created by Mr. Meier or his agents.

Accordingly, the Court finds that the special master shall review the documents which Respondents withheld based on the work product doctrine. *See* Section IV, *infra*. To guide the special master in his or her review of the privilege log and documents, the Court sets forth the following relevant findings in addition to the guidelines set forth above:

- Ms. Burga did not yet anticipate litigation in June 2010 because she maintains that she was not aware of the details of the Lichtenstein Foundations or the basis of her potential tax liability prior to her meeting with Mr. Meier. Burga Decl. ¶¶ 48–49, Dkt. 32-1; Kingston Decl. ¶¶ 5–6, Dkt. 32-1.
- At some point during Ms. Burga's investigation or the IRS's examination, Ms. Burga may have developed a basis to anticipate litigation arising out of the IRS's

8

examination. When that occurred is not clear to the Court based on the limited facts before it.

- The Sixth Circuit recognizes that a party's ability to identify certain facts regarding the underlying factual and legal basis for potential litigation supports a finding that the party reasonably anticipated litigation. *Roxworthy*, 457 F.3d at 600. Those facts are: (1) "a specific transaction [or set of transactions] that could precipitate litigation;" (2) "the specific legal controversy that would be at issue in the litigation;" (3) "the opposing party's opportunity to discover the facts that would give rise to the litigation;" and (3) the opposing party's general inclination to pursue this sort of litigation." *Id.* The Court does not hold that knowledge of all four types of facts is necessary to establish a reasonable anticipation of litigation. Instead, the Court simply finds them instructive considerations for the special master's analysis.

### D. Tax Practitioner Privilege

In September 2010, Ms. Burga and her counsel, Sideman & Bancroft, hired Respondent Russell Mansky and his CPA firm. Mansky Decl. ¶¶ 3, 6 (June 27, 2019), Dkt. 32-2 ("June 2019 Mansky Decl."). The United States' petition to enforce IRS summonses names Mr. Mansky as a respondent (Dkt. 1), and Mr. Mansky joins Ms. Burga's opposition to the United States' challenge to Respondents' privilege assertions (Dkt. 33). Through the course of this action, Mr. Mansky has submitted two declarations relevant to this dispute. Mr. Mansky submitted the first in April 2018 in support of his opposition to the IRS's petition to enforce summonses. *See* Mansky Decl. ¶ 4 (April 26, 2018), Dkt. 9-1 ("April 2018 Mansky Decl.")). On June 27, 2019, Mr. Mansky submitted a second declaration in support of Respondents' opposition to the United States' instant motion to compel. *See* June 2019 Mansky Decl., Dkt. 32-2.

The tax practitioner privilege provides that

> With respect to tax advice, the same common law protections of confidentiality which apply to a communication between a taxpayer and an attorney shall also apply to a communication between a taxpayer and any federally authorized tax practitioner to the extent the communication would be considered a privileged communication if it were between a taxpayer and an attorney.

9

26 U.S.C. § 7525(a)(1). Generally, the tax practitioner privilege does not apply to "communications regarding the preparation of tax returns." *United States v. McEligot*, No. 14-cv-05383-JST, 2015 WL 1535695, at *6 (N.D. Cal. Apr. 6, 2015). Based on this limitation and Mr. Mansky's statement in his April 2018 declaration that he was retained to prepare tax returns, the United States argues that the tax practitioner privilege does not apply to any communications with Mr. Mansky. Dkt. 26 at 8 (citing April 2018 Mansky Decl. ¶ 4, Dkt. 9-1).

Upon closer review, Mr. Mansky's April 2018 declaration provides that Sideman & Bancroft hired him "to review and, if necessary and/or possible, amend the 2001 through 2009 tax returns" as well as "prepare returns for 2010 and onward." April 2018 Mansky Decl. ¶ 4, Dkt. 9-1. This statement does not preclude the possibly that Mr. Mansky provided tax advice in addition to preparing Ms. Burga's tax returns. In his June 2019 declaration, Mr. Mansky states that he "performed services which were of a character and quality necessary for the Sideman firm to provide appropriate and accurate legal and tax advice to Francis Burga and the Estate," including "reviewing and interpreting tax and financial information and documents." June 2019 Mansky Decl. ¶ 4, Dkt. 32-2. The Court thus finds that Mr. Mansky may have provided tax advice in addition to preparing tax returns. The answer, of course, is in the documents.

Respondents state that they have disclosed the documents that relate only "to tax return preparation" and that the remaining privileged documents "reflect tax advice regarding what to claim on tax returns." Dkt. 32 at 11. In order to confirm that Respondents only claim privilege over communications properly covered by the tax practitioner privilege, the Court orders that the special master shall review the remaining withheld documents to determine whether they reflect tax advice. *See* Section IV, *infra*. To aid the special master's review, the Court notes that "Congress expressly modeled the Section 7525 privilege" on attorney-client privilege. *McEligot*, 2015 WL 1535695, at *6. And "[n]othing in [Section 7525] suggests that these nonlawyer practitioners are entitled to privilege when they are doing other than lawyers' work." *United States v. Frederick*, 182 F.3d 496, 502 (7th Cir. 1999).

////

////

10

**E. Respondents' *Kovel* Agreement**

Respondents also assert that the extension of attorney-client privilege recognized in *United States v. Kovel* protects documents reflecting Mr. Mansky's or his firm's activities in assisting Sideman & Bancroft in providing legal advice to Ms. Burga. Dkt. 32 at 12. The Second Circuit recognized in *Kovel* that attorney-client privilege extends to communications with an accountant employed by the client or attorney incident to the client obtaining legal advice from the attorney. 296 F.2d 918, 922 (2d Cir. 1961) ("[T]he presence of an accountant, whether hired by the lawyer or by the client, while the client is relating a complicated tax story to the lawyer, ought not destroy the privilege."). Here, Ms. Burga's counsel, Sideman & Bancroft, entered into a *Kovel* agreement with Mr. Mansky on September 15, 2010, under which Mr. Mansky agreed to assist counsel "in providing legal advice to Francis and the Estate." Dkt. 32 at 12. Respondents argue that this agreement protects documents that reflect Mr. Mansky's or his firm's activities in assisting Sideman & Bancroft by interpreting financial information to help them provide legal advice to Ms. Burga. *Id.*

The United States again points to Mr. Mansky's statement in his April 2018 declaration and argues that preparing tax returns does not "giv[e] rise to the privilege under the *Kovel* exception." Dkt. 26 at 9-10. As the Court discussed above (Section III(D), *supra*), Mansky's April 2018 declaration does not preclude the possibly that he provided tax advice in addition to preparing Ms. Burga's and the Estate's tax returns. Indeed, Respondents agree that *Kovel* does not cover communications regarding the filing of Ms. Burga's tax returns, and they represent that they have produced all documents reflecting "communications [that] were solely for tax preparation purposes." Dkt. 32 at 13. Respondents maintain that additional privileged documents exist, and the Court finds that to the extent those documents reflect communications "made in confidence for the purpose of obtaining legal advice from the lawyer," attorney-client privilege extends to those documents under *Kovel*. 296 F.2d at 922.

To confirm that the privilege recognized in *Kovel* properly applies to the remaining documents withheld by Respondents, the Court orders that the special master shall review them. *See* Section IV, *infra*. For this review, the Court finds the following parameters set forth in *Kovel*

instructive: "[i]f what is sought is not legal advice but only accounting service, . . . or if the advice sought is the accountant's rather than the lawyer's, no privilege exists." *Id. Kovel*'s extension of attorney-client privilege therefore does not apply "where the accountant is hired merely to give additional legal advice about complying with the tax code even where doing so would assist the attorney in advising the client." *United States v. ChevronTexaco Corp.*, 241 F. Supp. 2d 1065, 1072 (N.D. Cal. 2002).

### IV. APPOINTMENT OF SPECIAL MASTER: INITIAL STEPS

For the reasons discussed at the hearing and set forth above, the Court will appoint a special master pursuant to Fed. R. Civ. P. 53(a)(C) to review the documents that Respondents have identified as privileged on the grounds of the work product doctrine, the tax practitioner privilege and Respondents' *Kovel* agreement, using the guidelines set forth in this order.

To facilitate this appointment, the Parties are to meet and confer to reach agreement on the following:

- Identification of a special master with the capability and availability to review the subject documents. Any special master candidate will be required to execute an affidavit pursuant to 28 U.S.C. § 455;
- A process for educating the special master as to the relevant factual background in advance of the review and for responding to inquiries from the special master during the course of his or her review;
- A proposed schedule through completion of the special master's review;
- The Parties' stipulation to either Fed. R. Civ. P. 53(f)(3)(A) or Fed. R. Civ. P. 53(f)(3)(B).

The meet and confer sessions are to be in person or by phone and conducted by counsel with authority to negotiate and compromise. The Parties are to make a joint submission to this Court addressing the foregoing no later than **September 13, 2019**. To the extent the Parties are unable to reach agreement on any point, each Party's respective positions may be set forth in the submission. In particular, if the Parties are unable to agree upon a special master, each side may identify two qualified candidates, and the Court will make the selection.

Following the Parties' September 13, 2019 submission, the Court will issue a formal order of appointment setting forth a more detailed procedure for the special master's review and report and recommendation to this Court in accordance with Fed. R. Civ. P. 53(b). As will be addressed more fully in that order, the Court anticipates that the Parties will share the cost of the special master during the time of the review, subject to a further motion for a reallocation of costs at the conclusion of the special master's assignment. Fed. R. Civ. P. 53(g).

## V. CONCLUSION

For the foregoing reasons, the Court **GRANTS IN PART** and **DENIES IN PART** the United States' motion challenging Respondents' privilege assertions. Dkt. 26. The Court further finds that a final ruling on Respondents' privilege assertions requires an in-camera review of the documents at issue. As a result, the Court will appoint a special master in accordance with Section IV, *supra.*

**SO ORDERED.**

Dated: August 16, 2019

SUSAN VAN KEULEN
United States Magistrate Judge